PEOPLE *v.* HARTMAN.

LICENSES—VIOLATION OF BLUE SKY LAW—WHAT CONSTITUTES PUR-
CHASE AND SALE.

>   In a prosecution for violation of the blue sky law (3
>   Comp. Laws 1915, § 11945 *et seq.*), by selling stock not
>   approved by the Michigan securities commission, that de-
>   fendant had only an option on the stock and did not, at the
>   time the money was paid him by the purchaser, have it
>   in his possession for delivery, and that the purchaser
>   permitted defendant to retain said stock and sell and dis-
>   pose of it at any time he deemed it best to do so, *held,*
>   not to relieve the transaction from being one in the nature
>   of a purchase and sale of said stock.

Exceptions before judgment from recorder's court
of Detroit; Keidan (Harry B.), J.     Submitted June
13, 1924.     (Docket No. 95.)     Decided July 24, 1924.

W. Louis Hartman was convicted of violating the
"blue sky law."     Affirmed.

*McClear, Newman & Penniman,* for appellant.

*Andrew B. Dougherty,* Attorney General, *Paul W.
Voorhies,* Prosecuting Attorney, and *Robert M. Toms,*
Assistant Prosecuting Attorney, for the people.

SHARPE, J.     The defendant reviews his conviction
on exceptions before sentence on a charge of having
violated the provisions of Act No. 46, Pub. Acts
1915, being section 11945 *et seq.,* 3 Comp. Laws 1915
(the blue sky law).

The charge was based on several contracts entered
into by defendant with other persons, one of which
reads as follows:

"This agreement made and entered into this 6th

On the question of blue sky laws, see notes in 15 A. L. R.
262; 24 A. L. R. 521; 27 A. L. R. 1165.

day of April, 1920, by and between W. Louis Hartman, of Detroit, Michigan, party of the first part, and A. H. Williamson, of Detroit, Michigan, party of the second part, witnesseth:

"Whereas, the party of the first part has secured and is the sole owner of an option, dated November 3, 1919, given by the General Metals Corporation to purchase within ten months one hundred thousand shares of its common stock for five dollars per share provisioned for monthly purchases of not less than ten thousand shares per month, and,

"Whereas, it is provided therein that the General Metals Corporation shall retain in its treasury five hundred thousand shares of its capital stock and the holders of the original issue of four hundred thousand shares of such stock will not sell or market the same until one year from the date of said option, and

"Whereas, the party of the first part has entered into an agreement with Lewis H. Merritt of New York City, New York, whereby said Merritt is to supervise and manage the sale of such stock on the curb and in the markets of New York City, and for such services is to receive from the syndicate the sum of one thousand dollars per month, and ten per cent. of the net profits of said syndicate, together with necessary expenses, and

"Whereas, it is provided in said Hartman-Merritt contract that said Hartman will endeavor to procure persons herein called a syndicate, who will underwrite one or more of five hundred equal units, each unit to represent two hundred shares of the common stock of the General Metals Corporation, to be taken at five dollars per share, and

"Whereas, said party of the second part is desirous of becoming a member of said syndicate and of underwriting one-half unit thereof,

"Now, therefore, for and in consideration of the sum of one dollar and other good and valuable consideration, the receipt whereof is hereby acknowledged, the said party of the second part hereby agrees to underwrite 100 shares of the stock of the General Metals Corporation mentioned and described in the agreements aforesaid at five dollars per share, amounting to Five Hundred and no-100 dollars, and to pay therefor as follows:.....................dollars upon the

signing and delivery of this agreement, and the balance, if any, at such times and in such amounts as the party of the first part may demand.

"Said party of the first part hereby agrees that he will not demand any further payment upon this underwriting agreement unless it is necessary to carry out the terms and conditions of the contracts above referred to, and which are hereby made a part hereof and subject to the terms thereof.

"The party of the first part is authorized to sell and dispose of said 100 shares of stock at such times and for such prices as he may deem for the best interests of the parties hereto.

"The said party of the second part, at the termination of the aforesaid agreements is to receive a proportionate share of profits made upon the sales of the stock underwritten by said syndicate, less any expense that may be incurred by first party in connection with such sales and said agreements.

"First party will on demand render a financial statement of the affairs of said syndicate on the tenth day of any month.

"First party is hereby appointed the agent and attorney irrevocable of the party of the second part to carry out the contracts and purposes of the syndicate.

"Stock purchased in the open market for syndicate purposes may be sold under the direction of first party without notice.

"In witness whereof, the parties hereto have hereunto set their hands and affixed their seals the day and year first above written.

(Signed)    "W. L. HARTMAN      (L. S.)
(Signed) .  "A. H. WILLIAMSON  (L. S.)"

Attached to it was the following receipt:

"Received of A. H. Williamson $500.00 dollars to apply on underwriting for one-half unit of the above described syndicate, the same being ten per cent. of the amount hereinbefore underwritten.

(Signed)   "W. L. HARTMAN."

Mr. Williamson testified that no stock certificate had been issued to him, but he "supposed a stock would be issued."

"*Q.* But the point is this—it was your understanding no stock was to be issued to you, that if it was to be issued, it was to be issued to Dr. Hartman and then sold on the curb?

"*A.* Exactly so.

"*Q.* That your part as a result of this contract, your participation in the General Metals Corporation would be your proportionate share from whatever profits were realized from the sale of the stock on the New York curb?

"*A.* That is right."

He further testified that he paid the money to plaintiff "to turn it over to the company."

"I expected to sell the stock through the trustee, Dr. Hartman, and the syndicate. I expected the stock to be delivered to me simultaneously with the time it was traded upon the curb. I understood no stock was to be issued to me at all until such time it was upon the market."

Similar deals were made with two other persons. Defendant was not sworn as a witness. The trial court instructed the jury:

"I think, gentlemen of the jury, it is my duty in this case to charge you as a matter of law that the contract, or, rather, the contracts that have been offered and received in evidence in this case, known as—

"*Mr. Toms:* Exhibits 1 to 5 inclusive.

"*The Court:* Are contracts for the sale of stock to the second parties mentioned in such contracts. The words 'sell' and 'purchase' are not used in the contract but it seems to me that I should say to you, as a matter of law, they are contracts for the sale of stock to the second parties named in those contracts."

Section 10 of the act provides:

"Any person, * * * not the issuer, who shall in this State sell or offer for sale any of the stocks, bonds or other securities issued by any foreign or domestic investment company" except those specifically exempted "shall be deemed to be a 'dealer' in such

securities within the meaning of this act" and no dealer "shall sell or offer for sale any such securities"

unless ·and until he shall have complied with its provisions.    It is conceded that there was no such compliance on the part of the defendant.    A violation of any of the provisions of the act is made a misdemeanor. By section 14 it is made unlawful for any dealer—

"either directly or indirectly, to sell or cause to be sold, offer for sale, take subscriptions for, or negotiate for the sale ·in any manner whatever in this State, any stocks, bonds or other securities," except such as are expressly exempted, "unless and until said commission has approved thereof."

There was no approval of this stock issue by the commission.    Defendant's counsel insist that the transactions in which he engaged, as outlined above, did not constitute a "sale of stocks" within the meaning of these words as used in the act.

Under the recitals and terms of the agreement of April 6th, defendant represented to Mr. Williamson that he was "the sole owner of an option" to purchase 100,000 shares of the common stock of the General Metals Corporation, and that he had entered into a contract with Mr. Merritt of New York to sell them "on the curb and in the markets of New York City."    While Williamson agreed that he would underwrite—that is, purchase or find purchasers for —100 shares of such stock at a price agreed upon of $5 per share, as a matter of fact he paid the full price for such shares.    The fact that he did not require delivery of them to him, but permitted defendant to retain them and "sell and dispose" of them at any time he deemed it best to do so, did not relieve the transaction from being one in the nature of a purchase and sale of stock.    Clearly, Williamson paid his $500 and defendant accepted it as the purchase price of 100 shares of stock.    To hold otherwise would permit a

dealer to make sales of stock without compliance with the law, if the purchaser would permit him to retain possession of the stock and constitute him his agent to dispose of the same.   That defendant did not at the time the money was paid have the stock in his possession for delivery cannot change the nature of the transaction.   He had an option to purchase it, and entered into agreements with Williamson and others which obligated him to secure it and, when he did so, the shares purchased by the several parties became their individual property, notwithstanding their agreement to let defendant market them in the manner provided.   If not a completed sale, it was clearly an offer or agreement to sell and within the letter as well as the spirit of the law.   *Edward* v. *Ioor,* 205 Mich. 617 (15 A. L. R. 256).   A review of the authorities wherein somewhat similar transactions were involved will be found in the notes in 15 A. L. R. 262; 24 A. L. R. 521; 27 A. L. R. 1165.

The exceptions are overruled and the trial court directed to proceed to sentence.

CLARK, C. J., and MCDONALD, BIRD, MOORE, STEERE, FELLOWS, and WIEST, JJ., concurred.